IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SHERRI PADRON,           §
    Plaintiff,          §
                      §
v.                      §    Civil Action No. 3:12-CV-2556-BF
                      §
CAROLYN W. COLVIN,    §
COMMISSIONER OF       §
SOCIAL SECURITY,        §
    Defendant.         §

## MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying the claim of Sherri Padron ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act") and Supplemental Security Income ("SSI") benefits under Title XVI of the Act. The Court considered Plaintiff's Brief, Defendant's Response Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. For the reasons that follow, the Court **AFFIRMS** the final decision of the Commissioner.

### Background[1]

**Procedural History**

On July 28, 2009, Plaintiff filed her application for DIB, and on August 11, 2009, Plaintiff filed her application for SSI benefits. (Tr. 147-53, 154-60.) In her applications, Plaintiff alleged a disability onset date of January 1, 2006, due to bipolar disorder, post-traumatic stress disorder ("PTSD"), a heart condition, ankle pain, and an eye condition. (Tr. 172.) The applications were

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

denied initially and again upon reconsideration. (Tr. 86-102.)

Plaintiff requested a hearing, which was held on January 19, 2011, before an Administrative Law Judge ("ALJ"). (Tr. 102-18.) Plaintiff, represented by counsel, testified at the hearing, along with a vocational expert, Dr. Donald Anderson ("VE"), a psychological expert, Dr. Robert Borda ("PE"), and another medical expert, Dr. Stephen Eppestein ("ME"). (Tr. 35, 37, 46-80). Plaintiff requested review from the Appeals Council, which considered additional evidence submitted to it, but ultimately denied the request on May 29, 2012. (Tr. 1-4.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on July 28, 1964, making her 41 years old at the time of her alleged onset date. (Tr. 38.) Plaintiff has a ninth grade education. (Tr. 60.) Plaintiff's past relevant work experience includes work as an assistant manager in the fast food and retail industries, a cashier, and a store clerk. (Tr. 38.)

**Plaintiff's Relevant Medical Evidence[2]**

Green Oaks Hospital

On December 18, 2006, Plaintiff was seen at Green Oaks Hospital. (Tr. 256.) Plaintiff complained of depression, anxiety, and an inability to cope. (Tr. 257.) Plaintiff also reported being off her medication for two years. (Id.) A mental status examination revealed Plaintiff's appearance and cooperation were good, her speech rate was normal with appropriate volume, and she was well-

---

[2] The Court notes that the arguments presented in Plaintiff's Brief center around her psychological impairments. As such, the Court will refrain from summarizing the medical evidence concerning Plaintiff's physical impairments.

oriented, but her mood was depressed and anxious. (*Id.*) The examination further showed that Plaintiff's thought processes were appropriate and well organized, her insight and judgment were intact, and there was no indication of suicidal or homicidal ideation ("SI/HI"). (Tr. 258.) Plaintiff was diagnosed with malingering and anxiety. (*Id.*)

Dr. John Lehman

On March 10, 2008, Plaintiff saw Dr. John Lehman for a clinical interview and a mental status examination. (Tr. 262.) Dr. Lehman observed that Plaintiff came alone and acted as her own historian. (*Id.*) Plaintiff ambulated without difficulty, but reported she was seeking disability benefits because she was not able to function due to depression and sadness. (*Id.*) Dr. Lehman's mental status exam revealed that Plaintiff's hygiene was adequate, her cooperation and concentration were fair, she was well-oriented, her recent memory was fair, and her "fund of information" was adequate. (Tr. 263-64.) The exam further showed that Plaintiff's mood was depressed, her rate of thinking was slow, and her language was unremarkable. (Tr. 264.) Dr. Lehman made the notation that Plaintiff was noncompliant with treatment for both her mental and medical health, and the doctor diagnosed her with moderate, recurrent major depressive disorder; panic disorder with agoraphobia; malingering; and assigned her a global assessment of functioning ("GAF") score of 45.[3]

LifeNet Community Behavioral

Plaintiff was seen for an intake visit at LifeNet Community Behavioral ("LifeNet") on May 27, 2009. (Tr. 310.) Plaintiff was described as being anxious and depressed with an affect that

---

[3] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. *See id.*

appropriately matched her mood. (*Id.*) It was noted that Plaintiff's hygiene was good and she appeared clean. (*Id.*) At a follow-up visit on June 4, 2009, Plaintiff's mood was neutral and her affect was somewhat flat. (*Id.*) Plaintiff's thought processes were described as being intact and goal directed, and Plaintiff reported being compliant with her medication. (*Id.*)

At an appointment on July 8, 2009, Plaintiff's mood was angry and upset. (Tr. 308.) Plaintiff's affect matched her mood, her hygiene was fair, and her thought processes were intact and goal directed. (*Id.*) Plaintiff reported being compliant with her medication. (*Id.*) The following week, on July 15, 2009, Kelleigh Head evaluated Plaintiff at an individual appointment. (Tr. 307.) Plaintiff's mood was anxious and upset; her affect was flat, although it did match her mood at times; her hygiene was fair; and her thought processes were intact and goal directed. (*Id.*) Plaintiff reported that her daughter had kicked her out of the house after an argument. (*Id.*)

On August 18, 2009, an outpatient exam by Dr. W. Elsaie indicated that Plaintiff was compliant with her medication, she did not have SI/HI, and she was partially responsive to medication. (Tr. 295.) Dr. Elsaie also noted that Plaintiff still gets depressed at times. (Tr. 297.) On October 22, 2009, Dr. Elsaie again found that Plaintiff was compliant with her medication, she did not have SI/HI, and she was partially responsive to medication. (Tr. 360.) On November 10, 2009, Dr. Elsaie made the same findings but noted additionally that Plaintiff still complained of insomnia and anxiety. (Tr. 359.)

During two outpatient exams on December 9, 2009, and January 11, 2010, Dr. Elsaie reported that Plaintiff was compliant with her medication, she did not have SI/HI, and she was partially responsive to medication. (Tr. 351, 354.) Dr. Elsaie's notes indicated that Plaintiff had no acute psychiatric symptoms although she was stressed because of financial problems. (Tr. 353, 356.)

4

On January 25, 2010, Dr. Elsaie's outpatient exam revealed that Plaintiff was compliant with her medication, she did not have SI/HI, and she was fully responsive to medication. (Tr. 348.) The doctor again noted a lack of acute psychiatric symptoms, but indicated that Plaintiff was stressed due to financial problems. (Tr. 350.) Dr. Elsaie also assessed Plaintiff on February 8 and April 15, 2010, and on both occasions the doctor reported Plaintiff was fully responsive to medication and she had no acute psychiatric symptoms. (Tr. 396-98, 402-04.)

For her March 8, 2010 outpatient exam, Plaintiff met with Dr. Gonzalo A. Aillon. (Tr. 401.) He reported that she was compliant with her medication, she did not have SI/HI, and she was partially responsive to medication. (Tr. 399.) Dr. Aillon's mental status notes indicated that Plaintiff was alert, well-oriented, had coherent and relevant thoughts, had no hallucinations or delusions, and had intact memory. (Tr. 400.)

In June, August, September, and November of 2010, Plaintiff saw Dr. Gary Letkof for outpatient examinations. (Tr. 384-95.) Each time, Dr. Letkof reported that Plaintiff was compliant with her medication, she did not have SI/HI, and she was partially responsive to her medication. (*Id.*) However, in August of 2010, Dr. Letkof reported that Plaintiff was fully responsive to her medication. (Tr. 390.) His notes also reflected that Plaintiff was alert, well-oriented, had logical and sequential thought processes, and she did not report any hallucinations or delusions. (Tr. 385, 388, 391-92, 394.) Additionally, Dr. Letkof's notes indicated that Plaintiff reported her medication was helping with her stability and she requested that no changes be made to her prescriptions. (*Id.*)

Dr. A. Olufemi Layeni

On October 23, 2009, Dr. Layeni performed a clinical interview of Plaintiff with a mental status examination. (Tr. 316.) Dr. Layeni assessed Plaintiff's daily activities noting that Plaintiff

5

has trouble sleeping and arises around 10 a.m., she then showers, brushes her teeth, and has breakfast around noon. (Tr. 317.) Plaintiff usually watches movies or listens to music, but once or twice a week she will do laundry, clean her room, and clean the bathroom. (*Id.*) Plaintiff does not drive or cook, but she can figure out change and handle her own finances. (*Id.*) Dr. Layeni noted that Plaintiff was groomed adequately, dressed casually, had below average eye contact, and appeared tense and uncomfortable. (Tr. 318.) Plaintiff's thought process was goal directed, although, slow with no tangentiality, circumstantiality, or loose associations. (*Id.*) Plaintiff denied any SI/HI, and while there was helplessness present, there was no hopelessness, hallucinations, or delusions. (*Id.*) Plaintiff was oriented except she did not know the doctor's address. (*Id.*) Plaintiff's insight was good and her theoretical judgment was intact. (*Id.*) Dr. Layeni diagnosed Plaintiff with recurrent and severe major depressive disorder and panic disorder without agoraphobia. (*Id.*) She assigned Plaintiff a GAF score of 50. (*Id.*)

Dr. Michele Chappuis

A psychiatric review technique ("PRT") and mental residual functional capacity ("RFC") assessment was completed by Dr. Chappuis on December 23, 2009. (Tr. 321-34.) Dr. Chappuis diagnosed Plaintiff with recurrent and severe major depressive disorder and panic disorder without agoraphobia. (Tr. 324, 326.) Dr. Chappuis found that Plaintiff had mild restrictions in her daily living activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 331.) Dr. Chappuis concluded that Plaintiff could understand, remember, and carry out detailed but not complex instructions. (Tr. 345.) Dr. Chappuis also opined that Plaintiff could make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to

6

changes in routine work settings. (*Id.*)

**The Hearing**

Plaintiff, represented by counsel, testified on her own behalf at the hearing held on January 19, 2011. (Tr. 48, 60-73.) Plaintiff indicated that she has a ninth grade education, and that she dropped out of high school because she became pregnant. (Tr. 60.) Plaintiff stated that she currently resides in an apartment that she shares with her friend, Cary. (*Id.*) Plaintiff reported that she no longer has a driver license because it was revoked due to her use of prescription medication, and that the last time she drove herself was approximately eight years ago. (Tr. 61.) Plaintiff explained that her friends give her rides because her anxiety keeps her from taking the bus. (*Id.*) Plaintiff testified that being around people makes her scared, nervous, and sick, and that she believes this is why she is unable to work. (*Id.*) When Plaintiff's counsel asked her how many people she could feel comfortable around, Plaintiff stated that she really was not comfortable with anyone and would rather be alone. (Tr. 62.) Plaintiff described her reaction to other people, stating that she shakes, her heart beats out of her chest, and she has blacked out before. (*Id.*) Plaintiff recounted that she has been diagnosed at various times with bipolar disorder, PTSD, and depression. (Tr. 62, 64.) Plaintiff testified that she believes her disorders stem from the fact that she was molested for a period of time starting around age ten. (Tr. 63.) Plaintiff reported that she is just starting to get counseling for this issue. (*Id.*) Plaintiff testified that although she worked fairly consistently through the end of 2005, she had flashbacks that exacerbated her anxiety around others and, consequently, she has since been unable to work. (Tr. 64.) Plaintiff stated that a typical day consists of waking up around noon, drinking coffee, cooking and eating sometimes, and listening to music. (Tr. 65-66.) Plaintiff testified that her depression comes and goes, but that usually she is depressed "a couple of times a

week." (Tr. 66-67.) Plaintiff described her symptoms as shakes and trembles that manifest into panic when she leaves her house. (Tr. 67.) Plaintiff stated that when she has a panic attack, she feels hot and her heart races, but she is still able to make decisions, use judgment, solve problems, and think clearly. (Tr. 67-68.) Plaintiff also reported that she takes her prescribed medication, and that while she sleeps longer when on her medication, she still has low energy when she is awake. (Tr. 68-69.) On cross-examination by the ALJ, Plaintiff testified that when she filed her disability claim she was living with several people and that she has lived with various friends, family members, and at a shelter before entering LifeNet housing. (Tr.70-71.) Plaintiff also testified that she sees her daughter and grandchildren about once a month, she does not attend church or belong to any organizations, and that she has not had any problems with the law since approximately 1988. (Tr. 71-73.)

A PE, Dr. Robert Borda, testified telephonically at the hearing. (Tr. 49.) The PE stated that after reviewing all of the medical evidence in the record, Plaintiff's symptoms did not meet or exceed any listing for presumptive disability. (Tr. 50.) The PE also testified that Plaintiff displayed moderate impairment in her functional limitations regarding her daily living activities; social functioning; and concentration, persistence, and pace. (*Id.*) The PE explained that there had been no episodes of decompensation for extended duration. (*Id.*) The PE opined that Plaintiff would be capable of performing simple, one to two step operations; she would have difficulty with complex operations; that any contact with the public should be incidental, not required; and that the job should be low stress with no specified work output. (Tr. 51.)

On cross-examination by Plaintiff's counsel, the PE agreed that due to her poor stress tolerance, Plaintiff would have poor reliability. (Tr. 52.) When pressed by counsel, the PE estimated

8

that Plaintiff might miss two days a month. (*Id.*)  However, the PE clarified that the limitations he

set forth regarding low stress and no required contact with the public were to account for Plaintiff's

poor stress response.  (Tr. 51-53.)  In response to further questioning by Plaintiff's counsel, the PE

reiterated his opinion that as long as the task assigned was simple, Plaintiff would have no issues

maintaining concentration and she would not require any additional breaks.  (Tr. 53-54.)

 The VE testified at the hearing regarding jobs in the national economy.  (Tr. 73-79.)  The

ALJ posed the following hypothetical to the VE: assume a person the same age and education as

Plaintiff who could perform a full range of light work, but who could never climb ladders or ropes

and could only occasionally use ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (Tr. 74.)

Furthermore, this person would have to avoid extreme heat, work with the public, and high output-

type jobs.  (*Id.*)  However, she could understand, remember, and follow simple instructions and she

could complete repetitive, unskilled tasks.  (*Id.*)  The ALJ then asked the VE whether such a person

could perform Plaintiff's past relevant work.  (*Id.*)  The VE responded that Plaintiff's past work

would be precluded, except for the cleaning job she held, which would satisfy the hypothetical.  (*Id.*)

The ALJ then inquired if there were any additional jobs that the person could perform besides the

position as a cleaner.  (*Id.*)  The VE responded positively, opining that such an individual could

perform work as a street cleaner, a polisher cleaner, and a housekeeper.  (Tr. 75.)  The VE testified

that there are 8,000 street cleaner positions in the state of Texas and 100,000 in the national

economy, 8,000 polisher cleaner positions in the state of Texas and 100,000 in the national economy,

and 16,000 housekeeper positions in the state of Texas and 200,000 in the national economy.  (*Id.*)

The ALJ then added the limitation that the hypothetical person could not sustain an eight-hour day

or a forty-hour work week, and the VE responded that there would be no jobs that such a person

could perform. (*Id.*)

On cross-examination by Plaintiff's counsel, the VE testified that the limitation of missing two days of work each month would not necessarily preclude a person from competitive employment. (Tr. 77.) The VE stated that such a person's candidacy for work would be a "marginal call" that would depend on many factors, such as whether the absence was episodic or routine, the reason for the absence, the employee's length of employment, the size of the company, and whether the work was paid or unpaid. (*Id.*) When Plaintiff's counsel posed an alternate hypothetical which included the person being routinely and frequently absent while already on probation, the VE agreed that such a person would be precluded from competitive employment. (*Id.*) The VE also agreed that a person who needed frequent, unscheduled breaks; had a severe concentration impairment; and abandoned tasks upon loss of concentration would be precluded from competitive employment. (*Id.*)

**The ALJ's Decision**

On April 20, 2011, the ALJ issued an unfavorable decision. (Tr. 28-40.) In that decision, the ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[4] Before proceeding to step one, the ALJ determined that Plaintiff met the disability insured status requirements through the date of the decision. (Tr. 33.) At step one, the ALJ determined that Plaintiff had not engaged in substantial work activity since her January 1, 2006, alleged onset date. (*Id.*) At step two, the ALJ found that Plaintiff's obesity, major depressive disorder, and panic disorder were severe impairments. (*Id.*) However, at step three, the ALJ determined that Plaintiff's

---

[4] (1) Is the claimant currently working? (2) Does she have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent her from performing her past relevant work? (5) Does the impairment prevent her from doing any other work? 20 C.F.R. § 416.920.

impairments did not meet or medically equal the requirements of any listed impairments for presumptive disability under the Social Security Regulations (the "Regulations"). (Tr. 33-34.)

Before proceeding to step four, the ALJ found that Plaintiff retained the RFC to perform a range of light work. (Tr. 38.) Specifically, the ALJ determined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, and stand, walk, and sit for six hours in an eight-hour workday. (Tr. 34.) Furthermore, Plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but she must never climb ladders or scaffolds. (*Id.*) Additionally, Plaintiff must avoid all extreme hot weather, high production jobs, and public work. (*Id.*) Finally, the ALJ found that Plaintiff has the ability to understand, remember, and follow simple one, two, and three step instructions and complete repetitive, unskilled tasks. (*Id.*) At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (Tr. 38.) However, at step five, the ALJ found that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy, such as a street cleaner, a polisher cleaner, and a housekeeper. (Tr. 38-39.) Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act from January 1, 2006, her alleged onset date, through April 20, 2011, the date of the decision. (Tr. 39.)

## **Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

11

423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits

12

is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

### Issues

1. Whether the ALJ's RFC formulation is supported by substantial evidence.

2. Whether the Appeals Council failed to properly consider new evidence.

3. Whether the ALJ failed to apply the proper legal standard in his credibility determination.

4. Whether the ALJ's hypothetical to the VE reasonably incorporated all of Plaintiff's limitations.

### Analysis

**Whether the ALJ's RFC formulation is supported by substantial evidence**

Plaintiff contends that the ALJ's mental RFC determination is not supported by substantial evidence. (Pl. Br. at 9.) Specifically, Plaintiff argues that the ALJ failed to consider the limitation set forth by the testifying PE, Dr. Borda, that Plaintiff might miss two days of work each month, and that the ALJ failed to consider Plaintiff's ability to sustain work when he was required to do so. (*Id.* at 10-16.)

The ALJ found Plaintiff not disabled at step five of the sequential evaluation process. Thus,

prior to making such a finding, the ALJ was required to assess Plaintiff's RFC. *See* 20 CFR § 404.1545(a)(5). An individual's RFC is her ability to perform physical and mental tasks on a regular and continuing basis despite her limitations. 20 CFR § 404.1545. A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An RFC is a reflection of the *most* a person can do based on the evidence in the case record. *Id.* at *4. In assessing the claimant's RFC, the ALJ will consider all medical evidence as well as observations provided by the claimant. 20 CFR § 404.1545(a)(3).

In this case, the ALJ incorporated mental limitations into Plaintiff's RFC. Specifically, he limited Plaintiff to non-public work and low production jobs. Additionally, the ALJ found that Plaintiff had the ability to understand, remember, and follow simple one, two, and three step instructions and she could complete repetitive, unskilled tasks. In support of his RFC assessment, the ALJ considered, *inter alia*, the following: (1) the claimant's own testimony as to her limitations due to her depression and anxiety; (2) the testimony of the PE acknowledging a history of depression and abuse but noting no evidence of decompensation and Plaintiff's overall stability on medication; (3) records from Green Oaks Hospital diagnosing Plaintiff with an anxiety disorder as well as malingering; (4) an examination by Dr. Lehman diagnosing Plaintiff with panic disorder with agoraphobia and moderate major depressive disorder, while noting malingering, non-compliance with medication, and that Plaintiff would benefit from treatment but she takes a helpless approach to life; and (5) an evaluation by Dr. Layeni diagnosing Plaintiff with major depressive disorder and recurrent and severe panic disorder without agoraphobia. (Tr. 35-36.)

Plaintiff first contends that the ALJ failed to consider the PE's limitation that Plaintiff might miss two days of work per month due to stress. (Tr. 52.) At the hearing, the PE testified that

14

Plaintiff was capable of doing simple one to two step operations, she would have difficulty with complex operations, any contact with the public should only be incidental and not a required part of the job, the job itself should be low stress with no specified high work output, and she could adequately interact with co-workers and supervisors. (Tr. 51.)  Upon cross-examination by Plaintiff's counsel, the PE stated that based on Plaintiff's anxiety, related to dealing with stress and social interaction, she had a tendency to walk away and leave jobs. (*Id.*)  The PE further opined that her poor reliability was directly related to her poor stress tolerance and that this *might* lead to Plaintiff missing significant work each month. (Tr. 52.)  When pressed by Plaintiff's counsel regarding how many days Plaintiff might be absent, the PE responded "[a] sheer guess is that she'd probably miss two days a month." (*Id.*)  However, the PE further clarified, "[t]hat's why I specified that the job would have to be low-stress." (Tr. 51.)  Additionally, the PE also explained that was why he limited Plaintiff to only incidental contact with the public. (Tr. 52-53.)

In his RFC assessment, the ALJ afforded the PE's medical opinion significant weight, which Plaintiff does not contest in her brief.  Furthermore, the ALJ accounted for the PE's limitations described at the hearing when he limited Plaintiff to non-public and low output jobs which only consist of simple instructions and unskilled tasks.  The PE testified that Plaintiff's absences from work were directly related to her poor stress tolerance and social anxiety, which is why he opined that Plaintiff should be limited to non-public and low output jobs.  The ALJ incorporated these limitations into his RFC formulation.  Thus, Plaintiff's first contention fails.

Moreover, even if the ALJ committed legal error by not including the limitation that Plaintiff might miss two days of work per month into the RFC, "[p]rocedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."

15

*Audler v. Astrue,* 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364

(5th Cir. 1988)) (internal quotation marks omitted).  Thus, Plaintiff must additionally show that

prejudice resulted from the ALJ's alleged error.  However, Plaintiff cannot demonstrate that the

ALJ's inclusion of her missing two days of work a month might have led to a different outcome

because the VE did not testify that such absences would preclude a person from competitive

employment. Instead, the VE explained that "absences between one to three per month . . . could

result in some disciplinary action." (Tr. 77.) He further stated that whether these absences would

preclude Plaintiff from competitive work would be a "marginal call" that would depend on many

factors. (*Id.*) Only when Plaintiff's counsel posited to the VE that if "they were routine, frequent

absences from the time that the hypothetical individual started the job and they were on probation

. . . ." did the VE agree that such absenteeism would preclude the person from competitive

employment. (*Id.*) Nonetheless, such assumptions were never made by the PE nor the ALJ and there

is no evidence that Plaintiff would be on probation or that the factors described by the VE would be

applicable to Plaintiff and negatively affect her ability to maintain employment.  Accordingly,

because the VE did not testify that two absences from work a month would preclude competitive

employment, Plaintiff cannot demonstrate that the ALJ's lack of including such a limitation in his

RFC prejudiced her. Thus, even if the ALJ erred, which this Court has already found that he did not,

remand of the case would not be necessary.

       Plaintiff additionally argues that even if there is available work that she can perform, the ALJ

failed to make a specific finding as to whether she can sustain that work on a continuous basis. (Pl.

Br. at 13.) In the Fifth Circuit, a claimant's ability to maintain employment is incorporated in the

RFC determination unless a showing has been made that the claimant's ailment "waxes and wanes"

in its manifestation of disabling symptoms. *See Frank v. Barnhart,* 326 F.3d 618, 619 (5th Cir. 2003); *Perez v. Barnhart,* 415 F.3d 457, 465 (5th Cir. 2005). The ALJ does not have a duty in every case to make a separate finding that the claimant can maintain employment. *Frank,* 326 F.3d at 619. In analyzing another case out of the Fifth Circuit, the *Frank* court explained that "in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time." *Id.*

Plaintiff has failed to argue or present any medical evidence in either of her briefs which would establish that Plaintiff's condition "waxes and wanes." (*See* Pl. Br. at 13-16; Pl. Reply Br. at 3-4.) Plaintiff simply contends that because the PE testified that Plaintiff might miss two days of work a month, that should have put the ALJ "on notice [that] sustainability was an issue to address." (Pl. Reply Br. at 3.) However, as this Court has already explained, the ALJ limited Plaintiff to no public interaction and low-stress positions so that she would not have those types of absences from work. Furthermore, the PE testified that two absences from work a month was a "sheer guess." (Tr. 52.)

Plaintiff additionally argues that a letter from her case manager at LifeNet, Kelleigh Head, MA, supports a finding that Plaintiff's condition "waxes and wanes." (Pl. Br. at 16.) In the letter, Ms. Head opined that Plaintiff would have difficulty maintaining employment because of her mental illness symptoms. (Tr. 245-46.) Ms. Head described Plaintiff's depression as sometimes lasting for several days, or even weeks, and that Plaintiff isolates herself for that entire time period. (*Id.*) Nonetheless, Plaintiff fails to point to any medical evidence which supports this letter from her case manager, who is not a licensed physician or psychologist, or an "acceptable medical source" under

17

the Regulations. *See* 20 C.F.R. § 416.913(a). Moreover, any opinion provided in the letter is not a "medical opinion" for which the ALJ would be required to consider. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources . . ."); *see also* 20 C.F.R. § 416.913(d) (evidence from other sources, such as Ms. Head, *may* be utilized by the ALJ to show the severity of a claimant's impairments and how it affects her ability to work.)

Instead, the medical evidence in the record does not support the observations provided by Ms. Head. The medical records from Dr. Lehman demonstrate that Plaintiff is stable on medication, which is in direct contrast to Ms. Head's letter. Additionally, both Green Oaks Hospital and Dr. Lehman diagnosed Plaintiff with malingering, again, in direct contrast to Ms. Head's letter. As previously described, the PE opined that Plaintiff was capable of maintaining employment with certain limitations. Finally, and most notably, the physicians who treated Plaintiff at LifeNet from August of 2009 through August of 2010 repeatedly opined that Plaintiff was either partially or fully responsive to her medication and that she had no acute psychiatric symptoms. Additionally, Plaintiff continuously reported to the doctors that she had no SI/HI and she told Dr. Letkof, a LifeNet physician, that her medication was helping with her stability and she did not want any changes to be made to her prescriptions. An impairment that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

Plaintiff does not point to any evidence that demonstrates that her condition is of sufficient frequency or severity as to prevent her from maintaining competitive employment. There simply is no medical evidence that Plaintiff's condition "waxes and wanes" such that the ALJ would have

been required to make a separate finding regarding her ability to sustain employment. Subjective complaints must be corroborated by objective medical evidence. *Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir. 2001).

In sum, the Court finds that the ALJ's mental RFC determination is supported by substantial evidence because the ALJ properly included the PE's limitations, as well as Plaintiff's ability to sustain competitive employment, into his RFC formulation. Accordingly, reversal is not required.

**Whether the Appeals Council failed to properly consider new evidence**

Plaintiff submitted new medical evidence obtained after the ALJ's decision to supplement her request for review to the Appeals Council. (Tr. 623-26.) On May 29, 2012, the Appeals Council denied Plaintiff's request for review, stating "we considered the reasons you disagree with the decision and the additional evidence . . . . We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 1-5.) In her brief, Plaintiff argues that the Appeals Council failed to properly consider the additional evidence submitted because the Appeals Council's decision did not explain the weight it gave to the new medical opinion evidence. (Pl. Br. at 17-20.)

The Regulations provide a claimant the opportunity to submit new and material evidence to the Appeals Council for consideration when deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R. § 404.970(b). For new evidence to be considered material, there must exist "the reasonable possibility that it would have changed the outcome of the Secretary's determination." *Latham v. Shalala,* 36 F.3d 482, 483 (5th Cir. 1994) (quoting *Chaney v. Schweiker,* 659 F.2d 676, 679 (5th Cir. 1981)). Additionally, to be considered material, the evidence must "relate to the time period for which benefits were denied." *Johnson v. Heckler,* 767 F.2d 180, 183

(5th Cir. 1985). Thus, as a corollary, evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. *Id.*

Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham v. Barnhart*, 163 Fed. Appx. 279, 281-82 (5th Cir. 2006).

Based on its internal procedures, the Appeals Council need not provide a detailed discussion about all new evidence submitted to it. *Higginbotham,* 405 F.3d at 335 n.1 (referring to a memorandum from the Commissioner's Executive Director of Appellate Operations dated July 1995). Nevertheless, where new medical evidence is so inconsistent with the ALJ's findings that it undermines the ultimate disability determination, several judges have found that the case should be remanded so that the Appeals Council can fully evaluate the treating source statement. *See Brown v. Astrue,* No. 3-10-CV-00275-O-BK, 2010 WL 3895509, at *4-6 (N.D. Tex. Sept. 13, 2010; *Lee v. Astrue*, No. 3–10–CV–155–BH, 2010 WL 3001904, at *7 (N.D. Tex. July 31, 2010); *Stewart v. Astrue*, No. 7–07–CV–052–BD, 2008 WL 4290917, at *4 (N.D. Tex. Sept.18, 2008). However, new evidence that is merely cumulative of evidence already considered by the ALJ is not material and, therefore, does not require remand. *See Moore v. Astrue*, No. 3-07-CV-2017-B, 2009 WL 5386134, at *3 (N.D. Tex. Nov. 13, 2009), *rec. adopted,* 2010 WL 165992 (N.D. Tex. Jan. 13, 2010); *Price v. Astrue*, No. 3-09-CV-1275-BD, 2011 WL 888260, at *3 (N.D. Tex. Mar. 11, 2011).

Here, because the new evidence is merely cumulative of evidence previously submitted to, and considered by the ALJ, Plaintiff has failed to demonstrate that the new evidence is material. The new evidence provided by Plaintiff for the first time to the Appeals Council is a treating medical source statement that consists of two typed single-spaced pages from Plaintiff's case manager, Karen Price, QMHP, and signed off by Dr. Gary Letkof. In the statement, Ms. Price describes her relationship with Plaintiff, details Plaintiff's current symptoms, and illustrates how Plaintiff's symptoms manifest in response to stress or social interaction. (Tr. 623-24.) Specifically, Ms. Price notes that she has been Plaintiff's case manager for the past two years. (Tr. 623.) She observes that clinic notes document that Plaintiff is compliant with her medication, does not abuse non-prescription substances, and is partially stable on her medication regimen. (*Id.*) Ms. Price continues by opining that as long as Plaintiff has been under LifeNet treatment, she "would not have been capable of maintaining any type of regular employment . . . ." (*Id.*) Ms. Price further documents Plaintiff's extreme reactions to social interaction by describing her inability to use public transportation and her tendency to separate from the group during support meetings. (Tr. 623.) Ms. Price also illustrates Plaintiff's poor reaction to stressors by detailing more extreme reactions to minor events such as the changing of her regular doctor and a bed bug scare at her LifeNet housing. (Tr. 624.) Ms. Price also notes how social interaction and unexpected stressors exacerbate Plaintiff's depression, causing her to isolate herself for days or weeks. (*Id.*) Ms. Price further explains that Plaintiff's only source of support has been her sister, who due to deteriorating health cannot be as supportive, and the lack of support coupled with concerns over the sister's health only serve to increase Plaintiff's anxiety and depression. (*Id.*) Ms. Price concludes by noting that Plaintiff's impairments are not readily apparent from her medical records at LifeNet, and largely attributes this

21

to LifeNet being understaffed and underfunded. (*Id.*)

Ms. Price's statement appears to be almost identical, but with slightly more detail, to the letter provided by Ms. Head, another LifeNet case manager, on February 11, 2011, which was already a part of the administrative record when the ALJ made his decision. (*Compare* Tr. 623-24, *with* 245-46.) A brief analysis of Ms. Head's letter demonstrates the similarities. This letter is also approximately two pages in length and begins with a brief history of Plaintiff's medical issues and her treatment relationship with Ms. Head. (Tr. 245.) Ms. Head then describes Plaintiff's entry into LifeNet supportive housing, observing that in order to be eligible, Plaintiff must be compliant with her medication and submit to random drug screening to ensure that she is not abusing non-prescription medication. (*Id.*) Ms. Head notes that upon entry into the program, residents are encouraged to obtain some form of income, and if they do so, are responsible for using thirty percent of their income for rent. (*Id.*) Ms. Head then opines that "it is evident that [Plaintiff] cannot function at a level that would meet with an employer's expectations . . . ." (*Id.*) Ms. Head goes on to describe Plaintiff's partial stability on medication, her tendency to isolate herself for days or weeks due to her depression, and her extreme reaction to unexpected stressors such as changes in routine or social interaction. (*Id.* at 245-46.) To substantiate Plaintiff's extreme reaction to unexpected stressors, Ms. Head describes Plaintiff's inability to use public transportation and her inability to interact with even small groups of strangers, citing her failure to procure identification from the DMV. (*Id.*)

First, Ms. Price's opinion, as well as Ms. Head's, that Plaintiff would be unable to sustain regular employment is essentially a finding of disability, which is a determination expressly reserved to the Commissioner. *See Frank,* 326 F.3d at 620. As such, the ALJ is not required to consider these opinions and they have no special significance in the ALJ's disability determination. *See id.; see*

*also* 20 C.F.R. § 404.1527(d)(1). Moreover, Ms. Price's statement is merely cumulative of other evidence contained in Ms. Head's letter, which was already considered by the ALJ in his decision. Accordingly, the new evidence submitted by Plaintiff is not material in that there is no reasonable possibility that it would have changed the outcome of the ALJ's disability determination.[5] Thus, remand is not required. *See Moore*, 2009 WL 5386134, at *3 (cumulative evidence is not material evidence that justifies a remand); *Price*, 2011 WL 888260, at *3 (same).

**Whether the ALJ applied the proper legal standard in his credibility determination**

Plaintiff contends that the ALJ failed to properly evaluate her credibility and, thus, his finding that her testimony was not entirely credible is not supported by substantial evidence. (Pl. Br. at 21-24.) Specifically, Plaintiff argues that because the ALJ did not explicitly address each of the seven credibility factors in SSR 96-7p,[6] the ALJ committed reversible error.[7] (Pl. Br. at 24.)

When a claimant establishes the existence of a medically determinable impairment that could

---

[5] The Court notes that even if the evidence could be considered material, it certainly does not dilute the record to such an extent that the ALJ's decision becomes insufficiently supported, as Plaintiff contends in her reply brief. (Pl. Reply Br. at 4-6.)

[6] The seven credibility factors include: (1) the claimant's daily living activities; (2) the location, duration, frequency, and intensity of the claimant's pain or symptoms; (3) factors that precipitate or aggravate these symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken; (5) other treatment the claimant receives or has received; (6) any other measures the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors relevant to the claimant's limitations due to pain or other symptoms. SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

[7] The Court notes that in support of Plaintiff's argument, she cites to two cases out of the Seventh Circuit, as well as a medical treatise on the impact of childhood sexual abuse. (Pl. Br. at 21-24.) However, this Court is only bound by the precedent of higher Texas courts and the United States Supreme Court. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex.1993).

reasonably be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of those symptoms to determine the extent to which they affect the individual's ability to do basic work activities. SSR 96-7p, 1996 WL 374186, at *2. This requires the ALJ to make a finding concerning the credibility of the claimant's statements about the symptoms and their functional effects. *Id.* "The ALJ's findings regarding the debilitating effect of the subjective complaints are entitled to considerable judicial deference." *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986). As such, the ALJ must articulate credible and plausible reasons for rejecting subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). Further, these reasons articulated by the ALJ must not be conclusory and should be supported by the evidence in the record. *Giles v. Astrue*, 433 Fed. Appx. 241, 249 (5th Cir. 2011). Additionally, regarding the SSR 96-7p factors, "there is no instruction that every factor must be discussed in detail in the [ALJ's] determination." *Id.*; *see also Clary v. Barnhart*, 214 Fed. Appx. 479, 482 (5th Cir. 2007) ("The ALJ is not required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility.").

At the hearing, Plaintiff testified that her anxiety, caused by being around people, prevented her from maintaining employment. (Tr. 61.) Plaintiff stated that she did not feel comfortable with anyone, and when she is around people she has panic attacks. (Tr. 62.) She described that during these attacks, she shakes, her heart beats out of her chest, and she has, on occasion, blacked out. (*Id.*) Plaintiff testified that she was diagnosed with PTSD seven or eight years ago, and that in the last two or three years, she was also diagnosed with bipolar disorder. (Tr. 62.) Plaintiff stated further that she had just begun counseling for her impairments, which was not helping yet, and that prescription medication only has a minimal effect on her symptoms because they still interfere with her ability

24

to work.  (Tr. 63-64, 69.)  Plaintiff testified that she wanted to be able to have a life and support

herself.  (Tr. 64.)  Plaintiff also acknowledged that she had worked consistently through the

beginning of 2006, but now she could not be around people or deal with paperwork because it was

too stressful.  (*Id.*)  Upon examination by the ALJ, Plaintiff testified that she lived with various

roommates from the years 1998 to 2009, including her friend, Cary, her husband, her daughter, and

other non-specified friends and family.  (Tr. 70-71.)  Plaintiff also stated that she has lived in

shelters.  (Tr. 70.)  Plaintiff acknowledged visiting her daughter and grandchildren sometimes, but

she testified that she does not attend church or participate in any organizations.  (Tr. 71-73.)

In his determination, the ALJ concluded that Plaintiff's statements concerning the intensity,

persistence, and limiting effects of her symptoms were not entirely credible.  (Tr. 35, 38.)  Even

though he did not discuss each credibility factor, the ALJ summarized Plaintiff's full medical record

and concluded that there was sufficient evidence that her statements were not entirely credible, as

they were inconsistent with the other evidence in the record.  (Tr. 35-38.)  The ALJ cited several

reasons to support this determination.

First, despite Plaintiff's testimony that her medication was of little help, the PE opined that

there was no evidence of decompensation and that Plaintiff was stable on her medication.

Additionally, the doctors at LifeNet consistently reported that Plaintiff was partially or fully

responsive to her medication. Moreover, Plaintiff reported to Dr. Letkof that her medication was

helping with her stability and she requested that no changes be made to her prescriptions.

In addition, the ALJ noted that on December 18, 2006, Green Oaks Hospital diagnosed

Plaintiff as malingering and with an anxiety disorder.  Dr. Lehman similarly diagnosed Plaintiff as

malingering with moderate major depressive disorder and panic disorder with agoraphobia. Also,

Dr. Lehman's notes discussed Plaintiff's excessive worrying about health problems, but her lack of follow through in doing what is asked of her to resolve those issues. The doctor's notes show that while Plaintiff said she cannot work because she cannot deal with people, Plaintiff reported being a social drinker. The doctor also concluded that Plaintiff was non-complaint with treatment, takes a helpless approach, and appears to overstate her symptoms.

Finally, the ALJ addressed the inconsistencies between Plaintiff's testimony that she was unable to work because she cannot be around people with the July 20, 2010 record that shows that Plaintiff requested an STD screening at Parkland's Garland Health Center due to her sexual activity with multiple sexual partners. (Tr. 444.) In addition, Plaintiff's statement contradicts her own testimony that she currently lives with a friend, that she has lived with various friends and family in the past, and that she has previously lived in shelters.

An ALJ's evaluation of the credibility of a claimant's subjective complaints is entitled to judicial deference so long as it is supported by substantial evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). Additionally, it is permissible for an ALJ to evaluate the credibility of a claimant based on the medical record. *Giles*, 433 Fed. Appx. at 249. In the case at bar, the ALJ summarized the entire medical record and articulated specific, plausible reasons for not finding Plaintiff's statements regarding the severity of her symptoms entirely credible. Furthermore, although the ALJ did not specifically discuss each of the SSR 96-7p factors, contrary to Plaintiff's contention, there is no such requirement in the Fifth Circuit. *See id.*; *see also Clary*, 214 Fed. Appx. at 482. Moreover, the Court points out that the ALJ did not completely discount Plaintiff's testimony regarding her anxiety and her inability to be around other individuals because he included limitations into his RFC that Plaintiff was only capable of non-public work and low production jobs.

26

In sum, this Court finds that substantial evidence supports the ALJ's credibility determination and there is no reason why the Court should not give it deference.

**Whether the ALJ's hypothetical to the VE reasonably incorporated all of Plaintiff's limitations**

Plaintiff alleges that the ALJ posed a defective hypothetical question to the VE and, thus, the ALJ could not properly rely on the VE's conclusion that Plaintiff was capable of performing jobs in the national economy. (Pl. Br. at 25.) Specifically, Plaintiff argues that the ALJ's hypothetical was based on an RFC that did not account for whether Plaintiff could sustain work or that Plaintiff would miss two days of work each month. (*Id.* at 26.)

The ALJ must incorporate all of a claimant's disabilities supported by the evidence in the record and recognized by the ALJ into his hypothetical question. *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002). Because this Court has already found that the ALJ was not required to make a separate finding regarding Plaintiff's ability to sustain work or include the limitation that Plaintiff would be absent from work two days a month into his RFC, Plaintiff's argument lacks merit. The ALJ's RFC formulation is supported by substantial evidence and since the ALJ's hypothetical question to the VE incorporated the RFC's limitations, the ALJ could properly rely on the VE's testimony that Plaintiff was capable of performing the occupations of a street cleaner, a polish cleaner, and a housekeeper. The Court finds that the ALJ's hypothetical question included all of Plaintiff's limitations which were supported by the evidence in the record and, thus, the ALJ met his Step 5 burden and his decision is supported by substantial evidence.

## Conclusion

For the foregoing reasons, the Court **AFFIRMS** the decision of the Commissioner, as it is supported by substantial evidence and the ALJ did not commit prejudicial legal error, and dismisses

Plaintiff's Complaint with prejudice.

   **SO ORDERED**, December /9 , 2013.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

28